Takeda Pharmaceuticals U.S.A. v. Sylvia Burwell Takeda Pharmaceuticals U.S.A. v. Sylvia Burwell Takeda Pharmaceuticals U.S.A. v. Sylvia Burwell Takeda Pharmaceuticals U.S.A. v. Sylvia Burwell Takeda Pharmaceuticals U.S.A. v. Sylvia Burwell Good morning. Good morning.  This is a case about an agency that blatantly disregarded its own regulation, a regulation that was critical to maintaining the careful balance that Congress struck in the Hatch-Waxman Act between innovators and generics. When a generic applicant, like HICMA, wants to introduce a drug for a method of use that is already patented, the Hatch-Waxman Act allows them to do that. It allows them to use that patent. It allows them to copy that use, and it allows them to do that without authorization from the patent holder, without license, and before the patents expire, provided that the applicant provide a patent certification and that the patent holder be enabled to bring patent litigation before the drug is approved. FDA understood that mandate, and it promulgated a regulation that deals precisely with that issue and with the facts of this case. The regulation requires, specifically, that if the applicant's drug includes an indication that is claimed by a use patent, the applicant shall submit an applicable certification. The regulation could not be clearer, and yet FDA did exactly the opposite here. FDA approved HICMA's drug for the prophylaxis of gout, knowing that it was already patented by Takeda, and didn't require a patent certification and didn't allow Takeda to litigate those patent rights before it approved the drug. Are you saying that just because it was the same indication that requires a certification? No. What I'm saying, Your Honor, is that the indication which was patented required the certification. The indication isn't patented. It's the particular method of use that's patented. I mean, they didn't patent colchicine for an indication of prophylactic treatment of chronic gout, right? That's not the patent. Well, Your Honor, respectfully, the use code that's listed in the orange book says exactly that, which it describes the patent as the use of colchicine for the prophylaxis of gout. That's U1020. They hold four patents, all claiming that exact same use code. And what FDA was obligated to do was once it knew that those patents existed, FDA was obligated to require HICMA to provide a patent certification so that the parties could litigate the patent case before the drug got approved. If the statute is properly interpreted, as the government argues, that reliance refers to the applicant's reliance only, how do you square the regulation? Well, the regulation, Your Honor... You understand my question. I do, I do. The regulation uses different language and different words than the statute does. The regulation actually matches what Congress said in the legislative history, which is that where the drug the applicant is seeking approval for, and it uses that word the, the controlling use patents that cover those uses must be certified to. And this is a clear indication, Judge Silberman, of where FDA speaks exactly to the statute and what it understands the statute to provide and what Congress said, and yet FDA is saying, oh, no, no, we don't have to abide by our regulation. We're going to ignore that. And that, Your Honor, that's arbitrary and capricious right there on its face. This case on that issue alone can be resolved. First, there are entitled to deference with respect to the interpretation of the regulation, special deference under Seminole Rock. Well, with regard to their interpretation of the regulation, but this regulation is not ambiguous. Nobody has ever claimed, including the government, that this regulation is ambiguous. This regulation has existed for 20 years after notice and comment, and there's never been a challenge to this regulation. This is just FDA ignoring it. In fact, Your Honor, if I can go one next step, the only explanation that the government gives, which is buried in two paragraphs at pages 38 and 39 of its brief, is that there is... where it cites, the only citation that it provides, is to a citizen's petition response that it gave in 2004 where it doesn't even talk about method-of-use patents. It's focusing on those other patents, Your Honor was pointing out, those patents that the applicant relies on. It doesn't even mention this regulation. It doesn't even mention the method-of-use patents. Give me a chance to look at page 38 and 39, see where you're referring to. This is in the... In the government's brief. Yeah, the FDA's red brief, I believe.  Where are you referring to? Top of page 39, Your Honor. And here they're citing... It's the word applicable, right? Right. This is their argument on the word applicable. And then the next sentence down, Your Honor, the FDA says, but as FDA has explained... Reinforce the relationship. Right. And the citation there... It's the previous sentence. It's the word applicable that the government is relying on. Right. And what they've done with the word applicable is they've basically said, well, that word applicable makes this part of the regulation inoperable because of the prior certification requirement in the earlier subsection, I1I. Is this your strongest argument, the regulation? Yes. And not only the strongest, but it's the clearest and easiest for this court to resolve this issue. And that's what I thought I would present the court with, which is the most straightforward. And I'm happy to discuss the other arguments as well, but the regulation is very clear on its face. And like I said, there's no question that a certification should have been required. Nobody's even disputing the existence of the method of use patents and the use code that was in the Orange Book that FDA knew existed, knew was there, and decided it was not going to require a certification. If the court has other questions, I'm happy to answer them. Otherwise, I'll reserve my time for rebuttal. Thank you. Good morning, Your Honors. May it please the Court. My name is Kate Stepson. I represent Takeda. The questions in Takeda's appeal have to do with essentially three things. One of them has to do with this issue of reliance, and the other two have to do with whether FDA arbitrarily departed without explaining itself from its two past statements about information required on colchicine labeling. So just to start with reliance. Let me just ask you about your counsel, the other petitioning counsel relying on the regulation. You didn't rely on the regulation. We did not, no. We are making essentially both of our arguments arrive at the same point, that the patents should have been certified to. Yes. Under either theory you win. Under either theory we win. Yeah, but I'm sort of puzzled that you're not relying on the regulation. We chose to take, because, of course, this was our data, we chose to take an approach that was record-based, that is data-based, and that is a narrower ground, we think, on reaching the same conclusion. But both of them, as I've said, end up at the same place in the end. But with respect to reliance, the Hatch-Waxman Act requires applicants when they're filing a 505B2 application, which is the short-form application. Wasn't the more obvious reading of the statute, the one the government has, it says the statute says relied upon by the applicant. It doesn't say relied upon by FDA. There's two issues with that, Judge Silverman, I think. The first is relied upon by the applicant can absolutely mean what we're saying it to mean in the circumstance where FDA steps in and does the applicant's job. Now, even FDA has recognized this. This is not something that FDA acknowledged in its brief, but its standard intake form for any of these applications, the 505B2 application form, asks the question, this is at Joint Appendix 835, the purpose of the following two questions is to determine if there is an approved drug product that is equivalent or very similar to the proposed product that should be referenced as a listed drug. So it is attempting at JA 835, 836, 837, to flush out whether there is a drug that's not referenced by the applicant in its application but upon which the applicant essentially is relying. And the key question is at 836. Is there a pharmaceutical alternative already approved? What are you reading from? Joint Appendix 836. Yes, I know. What is it? What is the document? This is the standard intake form that FDA uses whenever it's assessing a 505B2 application. So the question is, is there an alternative? The box is checked yes. The next question, is it approved for the same indication? The box is checked yes. Next question, is it referenced as a listed drug? No. And then there's a little note at the top of page 837 of the Joint Appendix that says, what's the name of this drug? The name is Colchris. When FDA, in exactly that circumstance, the right thing for FDA to do would have been to return the application to HICMA or Westward in order for HICMA to certify to the drug upon which it was relying. But it didn't do that. Instead, it went further, and it started to pick up Colchris' data. And this is the point where the record becomes the key and overwhelming series of evidence in favor of our position. Just take, for example, essentially the whole block of appendix pages in about the 800 range. There you find, among other things, repeated communications among FDA officials about HICMA's proposed labeling, about HICMA's proposed medication guide. Is your strongest argument on the labeling, that the labeling shows there's reliance? I think our strongest argument is on the labeling for this reason. But the strongest argument on the record, of course, is the batch of sites ranging from about 895 to 930. But you have a conclusion that the FDA provides that they would have approved it without even any mention of Colchris. Aren't they entitled to deference with respect to that? Are we to conclude they were lying? I think you are to conclude that that statement is not supported by what FDA actually did. It is hard to understand how FDA could say that it could have approved this drug without reference to Colchris when it called 50 people into a meeting to talk about the Colchris data, and that's at Joint Appendix 895. But to your point about the labeling, one of the great mysteries of the labeling, and this is something that FDA talked about repeatedly, is why the labeling actually contains some of the statements that it did. HICMA's data, such as it was, showed that with respect to the four drugs that HICMA chose to assess to support its 505B2 application, there were no interactions with the drugs that it chose. There was nothing wrong with co-administering those four particular drugs. Mutual's data, of course, which tested all of the drugs that had been found previously to cause adverse events, found something different, which is why when you get to the FDA folks talking about this at page 882, one of the things that they are saying to each other is, I don't see how we can justify this on the basis of Westward's data. Any warnings about co-administration between colchicine and the what are called CYP3A4 or P-glycoprotein inhibitors, that won't be from Westward's data. And that's why just... Was that available from research that was done prior to the Colchris application? No, it was not. The research that was done, such as it was prior to the Colchris application, showed that people died from being administered colchicine. What Colchris did, and this is, again, something that FDA was very forthright about in May of 2011 in its citizen petition response, what Mutual did when it submitted that data was to advance the field. That's why Mutual got patents on it, and that's why in 2009, right after Colchris was approved, FDA put out a safety alert that said this is now the standard. Your basic point, if I understand it correctly, is the label approved for Mitogair, warned generally against combining with inhibitors, right? The information that Mitogair produced, however, showed no problems with the inhibitors they showed. So, therefore, that warning, your argument is, could only have been based on Takeda's submissions. Correct, and I'm not even using sort of circumstantial evidence to get there. That's what FDA said over and over and over again. And to the question about whether, Judge Wilkins, there was anything before Mutual that could have supported that warning, I mean, let's look at what, again, FDA says, and this is in its 2014 memo while they're assessing the sort of final Mitogair approval. Before Colchris, there were no widely accepted specific recommendations for dose reduction with certain, these co-administered drugs, other than avoidance when possible and caution when necessary with vigilant monitoring of toxicity. That's the pre-Mutual studies warning. Here's the warning on Mitogair's label. Co-administration with these drugs should be avoided. If co-administration is necessary, you should either reduce the daily dose or reduce the dose frequency, and I want to hold on to that point for a minute, and the patient should be monitored for toxicity. That is a return to the pre-Colchris state of affairs except for one thing, which is that mention of the reduction of dosage or dose frequency, and that is straight from Mutual's data. But the problem was that because of the patents and because of HCMA's attempt, which it concedes to try to get around the patents, that information wasn't on the label, and that actually segues into the other two points of the argument. It seems that you didn't cite, at least I didn't see in your brief, a citation to 355D, but that's the provision that specifies when the secretary can refuse or can deny an application. But D1, the very first provision, says that the application has to have adequate tests to show that the drug is safe under the conditions that are recommended in the proposed labeling. Right. So I would think that I'm going to ask the same question to the FDA, so prepare your response. Why doesn't that show that if you have to change the label for it to be deemed safe and effective and you use data from Colchris as the grounds that you have, by definition under the statute, relied on that data? I think the answer to your question is yes, by definition you should be found to have relied on that data. And more to that point, FDA, I think, was really struggling with what to do here. And you can see that, again, from that all-hands, 50-person meeting about the data, because one of the slides they put up in that range of pages I gave you earlier is a slide that said, what are we supposed to do at this point? The public is calling out for an alternative to Colchris. But what Mitigari is proposing for its label, or what HICMA is proposing for its label, isn't supported by the data. That's exactly what that slide says. And this should not have come as a surprise to HICMA at any point during the process, because right when HICMA, which was then Westward, was discussing with FDA what it needed to put forward, and this is at Joint Appendix 1008, there was a meeting in July of 2011 between FDA and Westward. And one of the questions that Westward posed to FDA is, what are we going to need to put on our label in order for us to satisfy your past statements? And what FDA came back at that time and said was, specific recommended dose modifications. That's what they said in 2011. But what ended up in 2015 was a label that had no specific recommended dose modifications, no explanation, just to get to that separate arbitrary and capricious argument, about why that change occurred. It's impossible for me to understand what that explanation could have been, given that four years ago, with respect to this very applicant, they told the applicant. But that was for a tablet, not the capsule, right? That's a whole different application. No, it was actually as to both. That's a question that's very pertinent to that meeting, because one of the questions that was raised at that meeting was, what if we change it to a capsule? Does anything change? And FDA's response was, there are still the same safety concerns. So there's no difference between a tablet and a capsule, as far as FDA's position with respect to the recommended dose modification. On your reliance point, I take your point that reliance doesn't mean the same thing as listed or cited. But how are we going to apply this in future cases? Namely, what do we look for in the record? And I take your point as to all the facts in this case. But what kind of standard are we applying and trying to dig into what FDA looked at or didn't look at? How are we supposed to do that? I think this is, in that regard, a relatively straightforward case. This doesn't strike me as one that's kind of close to the decisional line. And that's precisely because you have FDA not only taking great care to review the data, to combine the data with Western Mutual, that was another point of discussion at the all-hands meeting, and you have FDA repeatedly saying, you can't label this product without including this information. Some cases will be a real morass for the court to try to figure out, did the agency rely or did the agency not rely on certain data? And I take your point, well, wherever the line's drawn in the future, we win. I get that, but I'm worried about the future. Right. I think in the immediate future what you would hope to see and what should have happened here, presumably, because of that intake form that I started with, is a far more rigorous front-end assessment about what the applicant is asking for and whether that applicant is going to be able to close the gap between the data that it submitted, which again, just hearkening back to this case, showed no interactions, and what FDA understood the state of play to be from all of Mutual's data. Suppose there was not a single mention of Colchris in the FDA's record of decision. What reaction then? If there was not a single mention of Colchris in the FDA's record of decision, I would have a far harder time standing up and telling you. Would you have any time? Would I have any time? I think that it would be an argument that I would have to draw from a lot of silent implications, and I wouldn't want to be in that position. Fortunately, I'm not, because FDA was very clear. In that case, you would argue it was arbitrary and capricious for the agency to approve it based on what they had before it, presumably. Presumably, because if it approved that drug. Because it didn't have enough before it. Exactly. If it approved that drug, yes, based on the data that only HCMA presented. You'd still have an argument on the label. You'd still have an argument on the label. You would. Because the label makes no sense without your client's permission. Without reference to and reliance on that other data. And then what exactly do you want to transpire on? So it goes back to the district court, goes back to the agency. Tell me exactly what you want. I think in light of what FDA itself said at Joint Appendix 1008, that exchange back in 2011, relating to not just the drug-drug interactions that we've been largely talking about with respect to the label, but also the acute gout flare, that separate argument we've got. In both of those instances, it said, you need this information on the label. This is a safety concern. In the normal case, what I would tell you, particularly if you're looking at the failure to explain, is that often in those circumstances you send it back for the agency just to explain itself and it's just a remand. I don't think that's appropriate here. I think whether we win on the certification point or we win on both certification and that failure to explain, the appropriate thing to do is to send it back to the district court for them to enter a summary judgment in our favor. That's what we saw here. And then for that court to vacate, to direct the FDA to vacate its approval of Minigari. Which would mean, though, what going forward? That you're going to get 30 months? Or how is this going to play out? That's what I'm trying to figure out. As a practical matter, what it would mean, the vacater of the approval of Minigari would mean that Minigari would have to be pulled from the market. The 30-month stay goes to the certification point. So it's a separate issue from the failure to explain the acute gout flares and the combination interactions. Minigari is in the market now. It is. But with respect to the 30-month stay, here's the situation. You saw in our briefing that right now there's a patent case going on in Delaware. That patent case, of course, was filed in a PRO posture because Takeda learned about this approval basically when the press release came out. It was litigated initially in a PI posture, went up to the Federal Circuit in that posture, and the denial of the PI was affirmed. What's happening now is a motion to dismiss. That's pending. The government says if that goes against Takeda, then our case is moved. That's not accurate, Judge Wilkins, for a couple different reasons. The first is it would depend on how it goes against Takeda. It may depend on whether it's appealed. I mean, all of this, of course, is exactly why the certification is supposed to occur because Takeda shouldn't have been put in the position of having to litigate carrying the burdens of an emergent kind of posture that it did. But be that as it may, the other reason that it's not moved is that patent case has nothing to do with our arguments here with respect to the failure to explain the labels except for this important thing. The arguments in the patent case have to do with induced infringement. The reason that HCMA is contending that there was no induced infringement is that the labels were simply too vague to suggest that there would be infringement. That is exactly, of course, the point that we are making in this case, is that the labels were too vague and that FDA should have, because it's specifically directed as to this single Colchicine product. Referring to the alert they sent out. The alert and to the citizen petition response. It said whenever you apply for this single ingredient product, you must include this in the label. And now what FDA says. What is a single ingredient? Just a single active ingredient? Yes. It's as compared to something that's a combination drug. A single ingredient. I knew it could be a combination. It means a single active ingredient. Right. But with respect to what FDA says now about that, if I could just have one moment to make this point, what FDA now says is, yes, we understand that back in the 2011 citizen petition response, we said that any application for a single ingredient Colchicine product to treat prophylaxis, for prophylaxis of gout flares, to prevent them, has to contain this language. But this is something different, because this product that HICMA sought approval for is for prophylaxis of gout flares. That, of course, was exactly the circumstance that FDA required that statement to be in. So that's the interaction between the patent case and this case. Counsel, I want to make sure I understand the difference between the two petitioners. My understanding is you do not associate yourself with a statutory argument, which your other counsel makes. If I understand his position, it wouldn't matter whether or not FDA relied on Cochris material or not. He would win under his theory of the statute anyway. You don't associate yourself with that position. Their position depends on the argument that the FDA did rely and therefore circumvented the statute. Yes, that is the argument that we're pressing. I'm correct in expressing the differences between the two of you. You are correct. But if Mr. Sitzman's argument carries the day. Oh, you'd like it to. Yeah, yeah, sure. We'll get behind it. Yes. There are no further questions. Thank you. Thank you. Good morning. May it please the Court. Sonya McNeil for the government. The FDA applied the statute and the regulations in a straightforward way. Can I ask you a question right at the outset? Yes. You conceded below that if the FDA explicitly relied on Cochris material, you lose. Correct? Your Honor, I think that's not quite what we said below. Pretty close. What we said below is that if the Cochris data were necessary to make the affirmative case to clear the hurdle that Judge Wilkins, you identified in 355D, then yes, it would be true that HCMA should have certified it. So it doesn't matter whether it doesn't matter then. There's an objective test that overrides whether the applicant does rely or does not rely. So, Your Honor, here I think it's helpful to take a step back. The answer is either yes or no. So I'd like to make sure I understand the question if I could. I'm asking from I understand your position down below. And, indeed, I hear a lot. Let me put a hypothetical to you. Suppose the FDA said, look, we relied heavily on the Cochris material. We looked at it carefully. The label reflects it and so forth. However, the applicant didn't rely. So, therefore, the statute, as we interpret it, means that the applicant doesn't have to. We'll certify. We'll certify based on our own determinations. Your Honor, my answer to that question is that FDA has never had occasion to interpret whether the statute would preclude that, but that's not our practice and that is not what happened here. Wait, wait, wait, counsel. I want to make sure I understand because down below I understood, counsel, to concede that if the FDA did rely, as just in my hypothetical, then petitioners win. If FDA had concluded that the Cochris study results were necessary for there to be substantial evidence of safety and efficacy as labeled for Midigar, then it would be true that HICMA should have certified to Midigar. But that's not our practice and that's not what happened in this case. Okay, but that takes away the statutory question. In other words, there's not much strain on the question of whether or not the statute should be read as limited to the applicant's reliance or whether the FDA relies because on the hypothetical we've just described, if the FDA explicitly does rely, then it would be inappropriate to certify. Your Honor, I am not conceding that because, of course, that reading of the statute would read the applicant entirely out of Section 355B2. So then you're saying your position is, it's not the position down below, your position is, even under my hypothetical, where the FDA explicitly relies on the Cochris material, makes no bones about the fact that we're relying on it, but we can nevertheless certify because the applicant didn't rely. That's your position? Your Honor, without meaning to be obstinate, I want to take a step back and make sure I understand the implications of your question. And I think the way that's easiest to do that is to explain how the process actually works. And this is as much of the reflection. That's a pretty straightforward question. Yeah, I'm a very simple-minded judge. I gave you a straight question. Look, we don't accept in this case, and it's not our argument, that a reading of the statute that would make the words the applicant entirely superfluous is appropriate. But it would be absurd otherwise. Yeah, well, then what's the answer to my hypothetical? That the FDA could explicitly rely on the Cochris material, say it over and over and over again. However, we certify anyway because the applicant didn't rely. So FDA doesn't certify, of course. I mean, what FDA would do in that circumstance... Approve, excuse me, not certify. Certify is the other term. You don't have to certify. You approve. Your Honor, we think that case does not... that hypothetical is not presented by this case. That is the worst answer. You know, that answer is not acceptable in this court ever. Many years ago, when late Justice Scalia was sitting as a judge here and a lawyer answered that hypothetical by saying that's not this case, he threw his briefs at them. Then, Your Honor, before I get hit with briefs, let me affirm that... Justice Scalia is now dead. He can't do it. Our position is that the words the applicant in the statute mean something. And here, FDA, if it had been presented with an application that did not contain sufficient evidence to show safety and efficacy... The only way... Keep going. I don't want to interrupt. It would have, as 365C and D set out, ordered the applicant or provided the applicant with the opportunity to supplement its application with sufficient data to show safety and efficacy. This is why the statute uses relied on rather than listed or cited, probably, because under Judge Silberman's hypothetical, it would be nuts, right? It would be nuts. And they probably realized it would be nuts to use the word listed or cited because that would create a situation that would allow... that would have allowed what Judge Silberman was hypothesizing, whereas relied upon is a broader term and encompasses not just explicitly listed or cited, but also encompasses the situation where even though you don't list it or cite it, you're necessarily relying on it, even if not cited, to get the approval because you need that data. In my hypothetical, remember, you're explicitly relying on it. You're explicitly. You're not implicitly relying. You're explicitly relying. I remember your hypothetical, Judge Silberman, and I think that that would be a tougher case and, with apologies, a different case for the government because there's good reason for Congress to have made the applicant the master of its application. If you concede that point, then the statutory argument goes out the window. Which is why you're probably not conceding it. I just think relied upon, maybe this just shows why your statutory argument doesn't work, which is relied upon can't mean listed or cited because otherwise it makes a hash of the whole scheme. Your Honor, here I think the facts are very helpful, and if you wouldn't mind, I think, an explanation of what actually happened in this case would illustrate perhaps more persuasively than I've been able to to date why the statutory question just truly is not presented here at rest on a false premise. So what FDA concluded in this case, and this is a scientific determination, was that HICMA's application within its four corners contained enough evidence to provide for a finding of safety and efficacy for Midigar as labeled. It's perfectly right, as Counsel for Takeda points out, that FDA looked at whether or not there was a pharmaceutical alternative. Remember, Midigar and Colchris are not the same. They're different in a way that's important, particularly when we start talking about drug-drug interactions. But if Takeda's argument is that FDA should have decided that HICMA had to rely on Colchris rather than on colprobenicid, which is the same drug that Takeda itself relied on, FDA reached the scientific determination in this case that that was not necessary. And so I imagine your next question will be, well, why on earth then does the record say the word Colchris? There are a couple of things that are important. 246, according to Takeda. I'm corrected. I'm corrected. Stop exaggerating so soon. That's a different case, Your Honor. That's a hypothetical that's not presented here. Now, remember, Takeda's argument is about the Colchris studies, their study results, their drug-drug interaction studies, and their agreed trial studies. So let's all remember that when we consider the word 246, that saying the word Colchris is not an invocation of the Colchris study results. And so let's... What about the label? That struck me as a particularly strong argument with respect to reliance. So the labeling and... Both with respect to the dosage... Okay. ...and with respect to the combined with inhibitors. Sure. So let me start with the combination because I think that that is an especially straightforward argument. Remember, Colchris is a tablet. It's a 0.6-milligram tablet. It can be split in half. And the Colchris dosage adjustments recommend that patients who are taking Colchris in combination with an enzyme inhibitor take half of a tablet instead of a whole one. And so when FDA was deciding what label would make a capsule, which cannot be split in half, safe and effective for approval, it directed, and this is at JA 1008 and elsewhere in that page range, as Takeda's capsule pointed out, it suggested that HICMA would be wise to conduct studies to determine what drug-drug interaction information should be included on the label because you cannot achieve the dose adjustment that the Colchris label contains with the Midgar product. So HICMA did studies and concluded that there was not the risk of drug-drug interaction with enzyme inhibitors, certain enzyme inhibitors, that the previously published literature with which Takeda's data was consistent had suggested. And so FDA decided whether or not... or how best to label Midgar in light of this seemingly surprising information. Again, the published literature that predated either of these companies' products and the studies that Takeda performed suggested that drug-drug interaction was a concern. HICMA's data showed that at least with respect to certain enzyme inhibitors, it was not. If HICMA had come up first with just its showing that there was no problem with A, B, C, D inhibitors, then the label presumably would have said no problem. So the label would read exactly as it does now because if HICMA had come up first, the label would say, as it does, with respect to the particular inhibitors that HICMA studied, drug-drug interaction is not a problem. There's no need for doctors to be concerned about dose-related toxicity. However, it had long been known, and FDA cited among other studies, a 1997 study that's on JA776, that drug-drug interactions could produce adverse results and that responding by lowering a dose might be appropriate as a means to head off or address adverse reactions. And so FDA concluded, in light of what we know now, specifically that drug-drug interaction is more nuanced, more difficult to generalize than we had originally understood, we think that as a matter of safety and efficacy, mitigar, a capsule that can't be split, should say, unless you are taking one of the enzyme inhibitors that HICMA specifically studied, be on alert for possible signs of interactions and consider adjusting the dose accordingly. Now, your sister counsel, when I put that question, or related question to her, said that the FDA was necessarily relying upon the Colchris data for that additional label language because the Colchris data added something new, because I specifically asked her, could this language have been based on prior research? And she said no. So why was she wrong? So the Colchris data said something specific about a particular class of enzyme inhibitors called dual inhibitors, but it didn't reveal for the first time that drug-drug interaction was a problem. This is something that everybody had already known for many years, and that was reflected, among other places, in the published literature that HICMA supplied in support of its application. And so it's simply not correct to say that HICMA's label can't be reconciled except by looking at the Colchris data because, again, the Colchris data was consistent with what the medical community already knew. What about a separate problem, a separate problem? The Colchris label specifically refers to the drug inhibitors that cannot be used or should not be used with the active ingredient, right? It says that some inhibitors pose a special risk of fatal interaction. But doesn't it list them? It lists some, that's right. It does. Whereas the label for Midegar, do I pronounce that correctly? Midegar. Midegar does not list inhibitor drugs that are dangerous. That's not right, Your Honor. Of course, the Midegar label, among other things, specifically highlights clorithromycin, which everybody agrees is an inhibitor. It does? Yes, it does. It doesn't list all the ones that Colchris lists. Well, I can't, as I stand here, represent whether it lists all the ones that Colchris lists. The Council for the Intervenors may be able to highlight that. But remember, Takeda's predecessor, Mutual, studied inhibitors that had previously been found to have adverse reactions. And so it's not news to anybody, it wasn't news to anybody even at the time that the Colchris studies were performed, that specific inhibitors created the potential for drug interactions. The question that FDA was answering was, since you can't achieve the Colchris dose adjustments with a capsule that can't be split in half, what should FDA do? What should the label say so that patients and doctors can use this drug safely and effectively? I see your point. When I go back and I ask you a question, suppose we concluded that FDA had in fact relied on Colchris material. What is the proper resolution? Well, I take Takeda's argument to be that FDA has merely given its say-so for why reliance on Colchris was not necessary to approve Mitigar. And so the appropriate course would be to remand for the agency for an explanation. I'm a little confused about whether it was necessary or not. Suppose we concluded the evidence suggests that reasonably read, that FDA did in fact rely on Colchris. What is the proper resolution? Well, Your Honor, you would be reaching that conclusion in the face of statements by FDA in the record. I'm just thinking hypothetically. Suppose we should conclude that. What is the proper resolution? So again, I think a remand to the agency for an explanation of what it believes the proper course to be would be appropriate. In other words, you would agree that the issue in this case from your point of view is whether or not the evidence shows or the record shows that there was in fact reliance on the part of the FDA on Colchris material. As to the record, yes. That's the key issue in the case. Was there reliance or was there not? I think that that issue can dispose of the case without the need to engage in whether or not the applicant and the application part of the statute should be understood in the way that I've suggested. What is our standard of review on that question? On the question whether FDA relied on Colchris? I mean, the FDA says it doesn't. Colchris, you know, or Takeda says that they did. What is the precise standard of review for that question? So it's the standard of review that this court would apply to any other scientific determination because that is the nature of the determination that FDA is making. The determination that FDA made was that HICMA's application within its four corners through the combination of the prior finding of safety and effectiveness of colprobenicid, which is a product that had been used to prevent gout for many, many decades, and the new studies that HICMA did to bridge the difference between its capsule and the colprobenicid tablet were sufficient to provide evidence of safety and effectiveness as Midgar was labeled. What about the regulation argument that Counsel for Elliott raises? Well, I mean, the first thing about the regulation argument is that it would impose a burden on applicants that the statute itself does not contemplate, and so I think that that is a good reason. But the text of the regulation, regardless of whether it's consistent with the statute, you haven't disavowed it, so we take the text of the regulation as it exists. So let's stick with the text of the regulation. So the text of the regulation, and here I'll go to page A9 of the government's addendum, FDA's position is that an applicable certification is a certification that is required by paragraph I1, Romanet 1. All of this depends on the listing in the new applicant's application. It is only if the applicant relies on investigations that were done by somebody else that there is an obligation to provide patent certification. But that all depends on the interpretation of the word applicable, right? It depends on the interpretation of the word applicable, yes. And you're really giving a rather strained interpretation because it looks like applicable refers to the kinds of certifications, the four steps. I mean, if it did do that, Your Honor, it's sort of strange that it doesn't say, you know, appropriate under circumstances 1 through 4. I admit the regulation looks pretty strange to me, but it's read more naturally the way counsel argues. Well, the possibility that the regulation could be clearer as the Supreme Court recognized in the Caraco decision... Your Honor, I disagree. And here, I mean, it's helpful to recognize a couple of things. I mean, one, Elliot's reading would make Romanet 3 superfluous. Elliot thinks that such drug means a drug substance, remember? So that makes it the case that since HICMA relied on an investigation that concerned colchicine, it would have to certify to Colchris, and you would never get to the question of whether or not the label for Midgar claims a use that is covered by a use patent. Now, remember that drugs can be approved and patented for more than one use. Let's imagine that colprobenicid had patents attached to it. It doesn't, but I think the hypothetical is illustrative. Colprobenicid was approved for use to prevent gout flares and to treat acute gout flares. And it is possible, as the statute shows, as FDA has always recognized, for a new drug applicant to seek approval, as HICMA did here, for one, but not necessarily all, of protected methods of use. But under Elliot's reading of the statute, you would never get to the question whether an applicant had decided... We're just talking about the regulation for a moment. Yeah, I'm talking about the regulation, too. And I think under the regulation, you would never... If I understood Elliot's statutory argument, it wouldn't matter whether FDA relied or not. If there is a reference drug out there that uses the drug in a certain way... I can't pronounce it. Colchicine? Colchicine. Colchicine, a certain way. Bango, that's enough. I mean, I take it that that is... That's Elliot's view. Yes, and it is precisely that view that makes their reading of the regulation and Romanet-3 do absolutely no work. Well, you could reject their reading of the statute. That's pretty extreme, and still agree with them on the regulation. I don't think so, Your Honor, because I think their reading of I1-Romanet-1 makes I1-Romanet-3 superfluous, whereas FDA has always recognized that this regulation, 314.50i, implements the statutory framework that's set out in 355b-2. We've never understood this to impose an entirely new burden, totally detached from whether or not an applicant has chosen to rely on investigations performed by somebody else, and that's for good reason. Your basic point is the plain language of the regulation doesn't make any sense to you. Is that right? That's not right. My point is that if you read applicable in the way that we suggest, it makes clear that Romanet-1 identifies the universe of patents that are potentially relevant but doesn't tell you as to a use patent when you need to certify. You need to look at the label in order to come up with that. I understand your argument. And this is perfectly congruent with the Hatch-Waxman scheme. Remember, the point of Hatch-Waxman is not to protect patent rights as such. That is the role of the patent laws. The point of Hatch-Waxman is on the one hand to encourage competition and on the other to encourage research. And so it's when a new applicant uses somebody else's research that the patent certification obligation attaches. Now, as this case illustrates, nothing prevents a patent holder from bringing a patent infringement suit if they believe that their intellectual property is infringed without regard to whether or not there has been reliance by the applicant. And an applicant... But they lose the period. They lose the period, but of course... Which is huge. Well, it's huge, but it's potentially also huge for the new applicant. Remember... I understand, but, I mean, the idea that, oh, you can still file a suit, yeah, but you lose the key that the statute provides you. But you potentially get treble damages, of course, under 35 U.S.C. 284. I mean, this is not a statute that is set up or in which Congress contemplated. There would be the sort of gamesmanship that FDA is being accused of engaging in. Here... What significance is it... I thought I saw on the record that the mutual data was public. It wasn't proprietary in the sense it wasn't confidential. Does that have anything... Does that answer any of the questions that are before us? A, is that correct? And B, if it is correct, does it have any relevance to any of the issues before? So the answer to your first question is yes, that's correct. The answer to the second question, I think, is no. Because the... In terms of investigations, if HCMA had relied on Colchris's studies, it would be relying on the published results of those studies, not on sort of the underlying trade secret data. And so while it might be an easier case for us, Your Honor, if I accepted that distinction, I don't think that it's one that operates here. Your Honor, you asked me a question earlier, and I fear we've gone away from it, about reliance and about how it can be that FDA said the word Colchris so many times and yet did not rely on it. And again, as I think the explanation of the DDI, the Drug-Drug Interaction Studies, has gotten some way to explaining, what FDA considered here was what the appropriate regulatory approach, not just for HCMA's product and HCMA's label, but for Takeda's product and the Colchris label, was in light of all of the information that it had before it about drug-drug interaction. But FDA nonetheless concluded, as is within its authority and expertise to do, that the four corners of HCMA's application contained sufficient evidence for approval and that the mutual studies didn't rebut it. For instance, if this court were aware of a previously decided case in the same area and distinguished it, you wouldn't naturally say that the court had relied on that distinction in accepting a litigant's argument. What would we do if we concluded that the FDA was perhaps confused or perhaps wrong in concluding that the only obligation to certify was put on the applicant if the applicant explicitly relied on the reference, in this case, Colchris, or the Colchris investigation? Suppose we conclude that the FDA apparently had a misreading of the statute and that that misreading of the statute may have affected their reasoning as to whether or not they relied or not. In other words, do you understand the point I'm getting at? Because we went through this dialogue. And I think you ultimately did agree that if the FDA explicitly relied on Colchris, then it would be arbitrary and capricious if they had not rejected the application that did not certify. You agreed to that. So I want to make sure that my answer preserves the distinction between the affirmative case for approval, the four corners of Hickman's application, and just concluding, as I think Judge Kavanaugh, your line of inquiry suggested earlier, that it is relevant, that it bears on, that it may raise a question about an application. But if you think, Your Honor, that FDA... If you're with me. Suppose we conclude the FDA seems to have a misreading of the statute, concluding that as long as the applicant didn't rely on material, it's not relevant to certification, contrary to, essentially, our dialogue. Would that affect our reasoning about whether or not the agency did rely? So, Your Honor, let me try to answer the question this way and please tell me if I've misunderstood you. I think the appropriate recourse in that case would be to remand to the agency for a more fulsome explanation of what role exactly the COCRIS data played in its approval of MEDICAR. Or what role, in any case, a reliance by the FDA would amount to. What would be the result? Because you can see there'd be a sharp difference between a situation where it doesn't matter how much we, the FDA, look at, no matter how much we rely, as long as the applicant doesn't, there's no obligation to certify. And, Your Honor, I hope I've made clear that that's not our practice. It's never been how we understand the statute. Well, that's the statutory argument that's made in this court. Well, we think you... You're preserving that. Yes, I'm preserving it. And I think you don't reach it. Because, again, I mean, here, FDA considered the COCRIS study results to decide whether or not, one, it was appropriate for COCRIS to continue to remain labeled as it was, and, two, whether anything about those study results cast doubt on the studies that HICMA itself did. And, again, it were the studies that HICMA itself did. Isn't the question, could the agency have approved without the COCRIS data? That is the question. The answer is yes. And that's a scientific determination. But we don't know that the agency did approve. Well, the agency's position is that it did approve, and I think that if you look at the Midgar label, that that just goes to show that that's, in fact, what happened. What does 355D1 mean when it says that in order to approve an application, you have to show that you've done enough studies to show that the drug is safe for use under the conditions prescribed on the label? So it means, I think, colloquially speaking, that the stack of paper you provide to the agency in support of your application has to be tall enough and has to be detailed enough to support a finding of safety and efficacy. And, remember, HICMA's application had two parts. It had FDA's prior finding of safety and efficacy with regard to colprobenicid, the combination product that we discussed, the product on which Takeda itself relied, and HICMA's studies to show that the differences between colprobenicid and Midgar didn't undercut the conclusion that Midgar was safe and effective for use to prevent gout. And so what D1 says, if you don't include all of those investigations in your submission to the secretary, the tests are not adequate to show that the drug is safe for use under the conditions in your label. That is grounds for refusing the application. I guess what I'm trying to understand is, because there are other provisions in the same statute that says if your label is false or misleading, then your application will be rejected, right? So the secretary has two choices. If they think that the label that has been proposed by an applicant doesn't say everything that it needs to say in order to conclude that the medication will be safe to the public, it could say your application is rejected or it could say change the label to include this language. Yes. Both of those outcomes are permitted, or either one of those is, you have to do one of those two things to comply with this statute, right? Yes, that's right. So if you tell an applicant you have to change your label in order for us to approve this drug and you have to add these three words, and those three words were based on data from a competitor's product, has the agency relied upon that data for approval of the label? So what's happened then is the agency has said, you, applicant, must amend your application to include the studies that would support those three words. And if those studies are product-specific, if those studies deal with some identified drug that is protected by a patent, you have to provide an appropriate certification. And so I guess, Judge Silberman, going back to the point where we started earlier, this may be in practice why the scenario that you posit hasn't come up, because FDA simply has no need to backfill a deficient application. Its response is instead to say to the applicant, who is the master of his application, look, we don't think we have enough information to approve your product. That's what they say should have happened here. That's what they say should have happened here, but again, it was FDA's scientific judgment that the application within its four corners contained enough evidence for Midgar to be approved to prevent gout as labeled safely and effectively. Then the oddity, then, is all the citations. Yes, the oddity is the citations. Because that does, and if we cite something 246 times, we've probably relied on it. Well, but here again, Your Honor, it's, and I... That's too simplistic, but just that's their point. That is their point, but I mean, it's important to realize, with apologies, how simplistic that point is. Because the thing that Takeda... Unnecessarily cited it is what your point is. No, it's not that we unnecessarily cited it. It's that we didn't... Then why did you, if it was not unnecessarily cited, why was it cited? So I would love to talk about this. So many of the citations, I mean, to Colchris, as we've discussed earlier, have nothing whatever to do with the Colchris studies. Now, let's tackle sort of the next tranche of citations, which are instances where FDA's Office of Prescription Drug Promotion used the word Colchris in its review of the proposed Midigar label. Remember, Colchris and Midigar rest on a common body of published information that preexisted either product. So, for instance... But wasn't the key that it was toxic? Again, that is something that was reflected in the published literature that predated either Colchris or colprobenicid. And so, quite appropriately, FDA said things like, on JA882, which is a citation that Takeda pulls out, this is the won't be from Westward data quote. If you look at the part of the label, and it's actually on 873, just because of how the trap changes are displayed, what won't be from Westward data, FDA is saying, is that toxicity has been reported. And across that reference is section 12.2 of the label where published case reports are discussed. And, of course, FDA is perfectly right that the toxicity information will not be from the studies of the four enzyme inhibitors that Hikma performed to bridge the gap between the old product and the new one. It will be from the literature that supported the finding of safety and efficacy for the old product in the first place. Similarly, at JA859, 861 to 863, and 887, these are places where Takeda says we've relied because we identified the Colchris label as a comparator. The Office of Prescription Drug Control said, well, this is a comparator where it's applicable. And the comparison that it was making was unrelated to the Colchris studies. It was instead about, for instance, the side effects of colchicine include diarrhea and vomiting. This was not new information. And FDA quite permissibly and prudently thought that two labels that rest on a common body of literature should both reflect that literature consistently. And basically, your argument is this, as I understand it. Even if the FDA honestly believed there was enough information either outside of Colchris or in the presentation that Medgar presented, even if they thought there was enough there to approve the application without any requirement of certification, it would have been inappropriate not to look at the Colchris material anyway, which even if you made a conclusion that you didn't need to rely on it, you'd still want to look at it. Is that your point? Your Honor, I think that's one of the points we're making, and particularly where there had been a citizen petition filed by Mutual arguing that Colchris is the cornerstone and must be the cornerstone of any future application for a single-ingredient colchicine product. It's quite appropriate for FDA to consider whether what it's doing in one case is consistent with what it's done in another. But that is not reliance on the Colchris studies. It's not reliance on the studies that showed for drug-drug interaction purposes that you could split the tablet in half and resolve some concerns. It's not reliance on studies for the AGREE trial, which, of course, this is undisputed here, was not necessary for Colchris to be approved to prevent gout in the first place. But it is relying if you're using it as additional information to support your conclusion. But, Your Honor, again, the statute reliance talks about the affirmative case for approval, and it only makes sense that it does. Because when an applicant... Suppose we cite five reasons for our conclusion and we don't say what would happen if we only had three of those reasons, but we cite all five. Have we relied on all five? Well, the hypothetical here is a little bit different. In my hypothetical, I am citing five reasons for my conclusion, and you are saying, well, I could imagine reason six, but reason six wouldn't be inconsistent with anything that you've said. So you know what? You've made your case. Reasons one through five persuade us that you have made an argument in favor of safety and efficacy for your product, and so on the basis of your argument alone, we are approving it. That's... Well, I think we're disagreeing on what six is, but anyway, that's probably neither here nor there. Well, so let me take a step back and explain why it makes sense to think of one through five and six in this way. Again, the fundamental trade-off that Hatchwacks and NNAID was between competition and research and innovation. If it were the case that an applicant who is taking the time and investing the money to perform these gap-bridging studies had no way to expect whether at the end of the day FDA would come up with something out of the blue that might require a certification to a different drug product that the applicant had no reason to believe they were relying on. Indeed, they didn't expect that they were relying on. That would not be consistent with the quid pro quo that is at the foundation of the statutory scheme. It would mean that rather than the applicant, the one who is making the choice to do its own research, to put forward its own drug to compete in the market, would have very little ability to predict how its application would be digested and to assess whether or not its investigations would win out in the end. And isn't it further support for that argument that when Colchris submitted its application for the prophylactic indication, they didn't do any new studies to support that paper NDA, right? They just relied on the published literature from the Cole, Permanisid, and whatever else was out there, right? Yes, and they did their own drug-drug interaction studies. Was that to support that application or was that used for the acute gout indication? So the AGREE trial was used for the acute gout indication and it may be that the drug-drug interaction studies also supported the acute gout indication. That was my understanding of the record. So I guess my point is that it would support your argument that if they can get their drug approved based on Cole, Permanisid and whatever else was in the public domain, why couldn't HICMA do the same thing? That is our argument, and Takeda's response to that argument is that FDA has a rule about choosing the most similar or the most appropriate product and that after Colchris was approved, that it should have been true that it was more similar to a single-ingredient capsule than the old combination drug. And for the reasons we explained in our brief, that's not FDA's policy. That's not a policy that we've ever maintained with respect to pharmaceutical alternatives, and a pharmaceutical alternative is, among other things, a different dosage form. A capsule, for instance, versus a tablet. And so, Your Honor, you articulate our point exactly correct, and I only want to make sure that I explain why the only possible response to that point, which is the one that Takeda makes, doesn't apply to drugs of this kind. Again, drugs that are different in dosage forms, drugs that are not either identical or pharmaceutically equivalent. And to the extent, going back to the pages 832 to 838 in the record where FDA evaluates the 505B2 application, to the extent Takeda's argument is that FDA should have decided what other drug was most similar and reached its finding of safety and efficacy in accordance with that, FDA concluded it didn't need to. And that was as a matter of its scientific judgment, and that judgment is entitled to death. Why don't we hear from Mr. Klein. Thank you very much. Thank you, and may it please the Court, Charles Klein for the interveners. I'd like to start, if I may, with the argument by Takeda's counsel that HCMAS label makes no sense without the COCRIS data. I believe they said that was their strongest argument. It is just not true. HCMAS label comes entirely... The label we're talking about, the portion of the label we're talking about is the portion discussing drug-drug interactions that says reduce the dose, avoid it, if necessary, reduce the dose and monitor. That comes entirely from the literature. That's exactly what FDA repeatedly said in the record, and in particular, and this was noted briefly by the Department of Justice, but on JA-776, FDA does talk about how the literature disclosed that you avoid when possible and use caution when necessary with vigilant monitoring for clinical signs of toxicity. That comes from the literature. More importantly, this discussion cites in footnote 4 an article called Tatesky, I don't know if I pronounced it correctly, from 1997. It's not in the record, but I'd be happy to provide it to the court, and that article repeats virtually... It's almost identical to what is in HCMAS label. It talks about how when you have two drugs that are known inhibitors of this P450, it's likely to cause toxicity, and therefore it may necessitate dose reduction and careful monitoring, and then it specifically talks about Colchicine and says the use of these types of drugs in combination with Colchicine should be avoided, but in case their administration is unavoidable, extra care should be exercised, and the patient should be followed closely for the development of excessive Colchicine effects. That is exactly what is in HCMAS label. HCMAS label does not rely in any way, shape, or form on any Colchis investigation. And I think... Well, what significance do you give to the alert that the FDA put out after Colchis did the studies and showed that certain inhibitors were combined with the Colchicine were particularly dangerous? Well, that, too, was in the literature. The literature disclosed that... Well, and why did the... If it was strictly in the literature, why did the FDA, based on the Colchis material, put out the alert? Because the alert talked about the Colchis investigations, and that's the term from the statute. I want to be very clear about what those investigations were. They were very specific. There are two of them. The first one, the first Colchis investigation, concerned specific reduced Colchicine doses when combined with these other drugs. The only thing that Takeda did that wasn't already done was come up with specific doses. Right. Right. And... Reduced doses. Specific reduced Colchicine doses, which most of the time is half a tablet, which wouldn't even apply to Medicar. And the other investigation we're talking about here is a specific dosing regimen, three pills in an hour to treat an acute flare. Right. That's it. That's the investigations we're talking about. They are very specific to dosing. None of that dosing is in Hikma's label. Hikma's label just says, reduce the dose without any specific instructions and monitor carefully, especially because you can't give... You can't put it in the Medicar label because you can't take half a capsule. And as a practical matter, the doctors aren't co-administering these drugs. That's what the Federal Circuit and Judge Robinson said because it's dangerous to do so. And so that's why the label, the Hikma label, says avoid it if at all possible. And it's almost always possible to avoid because there are alternatives to Colchicine and these other drugs. And then they say if it's really not possible to avoid, just be very, very careful. Monitor carefully. And you don't want specific dosing in the Hikma label because, number one, you can't take half a tablet, and number two, toxicity turns on the particular drug that's being combined with Colchicine and the particular patient. And this is what FDA discussed. Wait a minute. I'm a little confused. Yours was a tablet? No. Ours was a capsule. Yours was a capsule. So why do you keep saying you can't take half a tablet? Because you can take half a tablet. You can take half. I'm sorry. If I said half a tablet, I misspoke. I meant you can't take half a tablet. I thought you were at it. I apologize. Right. So Takeda's label says take half a tablet. Right. You can't take half of the Midgar capsule. I misspoke. Right. Okay. And so it wouldn't make sense to put that type of thing. You have to be old enough to know how you deal with capsules and tablets. Right. Yeah, half a capsule and everything falls out. Does the label for colprobenicid have any warning, similar type of a warning? I don't believe there's any type of warning like that in colprobenicid. The warning comes from the literature. It doesn't come from any Culker's investigation. In terms of the reliance, and we heard 246 times Culker's was mentioned, well, what FDA did. Well, you concede as well as I think the FDA grudgingly conceded. If the FDA feels that it has to rely on its own material, that it must, as a matter of law, send back the application. I do agree. That's under D1. So the way the process would work. So all this talk about reliance refers to the applicant. Is it really an irrelevant argument? Well, it's relevant in this sense, Your Honor. The statute talks about reliance by the applicant on investigations. So you look at what the applicant relied upon. If what the applicant relied upon is not sufficient. Basically, all I'm saying is that petitioners are correct in so far as they argue that if the FDA relies on Culker's material, then it violated the APA in this case. Well, if FDA had relied upon the material, then it would be a question as to whether the application should have been rejected under D1. And that's a scientific determination. Wait a minute, wait a minute, wait a minute. If they had relied, if they, being the FDA, had relied, you agree it would have been a violation of the APA? To approve, because it should have been. Right, yeah. Because it should have been rejected. If they had to, if they had to, if the information was necessary for approval and the information HCMAS submitted was insufficient, FDA should have rejected the application. And required the Paragraph 4 certification or required some other. That's correct. So that really gets rid of 90% of some of the arguments that were made in this case. Well, but the key issue here is when FDA found that HCMAS application was sufficient, that's a scientific determination entitled to the highest level of judgment. Absolutely. If there were no citations to Culker's, we probably wouldn't be here. That's the point, relied. It really comes down to what does relied on mean? Well, relied on. As applied to a set of facts where it's cited all over the place. And I think a good analogy would be when this court issues an opinion and distinguishes a case, the court is not relying on the case it distinguishes to support the conclusion in the opinion, even though the case is mentioned in the opinion. And that's like what we do is science. But that's what happened here. In fact, what FDA did is exactly what Takeda says FDA should do. It addressed its prior citizen petition ruling. FDA said. What about the regulation? Okay. I'm happy to talk about the regulation. The regulation. And also circle back after you do that to the word distinguish. I want to focus on that. But do the regulation. I'll let the presiding judge handle the distinction. How are you using the word distinguish? Why are you saying, what does that mean in your terminology? Because that was a key term you just used. If you are just distinguishing, what do you mean by distinguish? Well, there's a prior citizen petition ruling out there that said under the hypothetical before FDA at the time, if you had the culprits label and you redacted out the acute flare indication, would that be safe? And FDA said at that time, based on that label, well, that would raise safety concerns. Well, now it was presented with a different label and a different application. And so FDA did what it should do. It looked at its prior citizen petition ruling and say, the situation we now have is different. And what is in the HICMA label is okay. Because it talks about how you shouldn't, the product's not approved for flares. We haven't conducted safety tests as to whether there'd be toxicity if you took it to take flares when you're taking it as a prophylactic. If you have a flare, consult your healthcare provider. And by the way, the maximum daily dose is 1.2. I don't know why, and we're going to get to the regulation, but why we should be doing this triple bank shot analysis here when parsing this, what they, it's cited a lot. It looks in the common parlance like something you would say is reliance. The agency could go back and tell us, no, actually, no. It's totally unnecessary to any of the Colchris data. And you're saying that's a waste of time, but I'm saying that's a hard, that's hard for us to do at this point, I think. Well, actually, what I'm saying is FDA did say that in the record. Yeah. In JA 899, JA 773. But they have, but they also have all the other information. That's the problem. I mean, I guess that's the point is, we don't know what relied on means as applied to this set of facts, given all the information in the record. Well, but it's a, ultimately it's a scientific determination. FDA said in the record, it approved Hickman's application based on what Hickman had provided. That's a scientific determination. So as long as there's a rational basis in the record, this court has to affirm. I mean, in fact, the court has said scientific determinations are entitled to the highest level of deference under the APA. All right. Now I'll get to the regulation. Not for the regulation. The regulation on its face seems to support petitioners, doesn't it? No, I disagree. I know you like that use of the word apical. Let me take it from a different approach. So I wouldn't be surprised. 3, 3, 1, 4.50. I won Roman at one. Combined with Roman at three is implementing 505 B2. And let me explain why. I'll just call Roman at one. And hopefully we know we're on the same page. Roman at one is defining the types of patents that may require certification. And it talks about a patent that claims the drug. And there's no dispute that the reg and the statue are talking about a drug product here, like Cochran's. Or claims an approved use for such drug, referring back to the same drug product that's relied upon for approval. What the regulation doesn't say in Roman at one, is what's in the statute in 505 B2A, which when it talks about use patents, says use for such drug for which the applicant is seeking approval under this subsection. That language from 505 B2A is not in Roman at one. That language is, is. In the beginning of the regulation. Well, it's in the Roman at, no, it's the opposite. It's in Roman at three B. Oh. Okay, so this is how it works. It's a little convoluted. But Roman at one, Roman at one says, this is the universe of patents you may have to worry about. Patents covering the drug you relied upon, or patents covering a use that, for the drug that you relied upon. And then you go to Roman at three, which deals with method of use patents. And method of use patents can be complicated because as Roman at three, a and B say, you now look to whether the applicant seeking approval for the use. If the applicant seeking approval for the use claimed by the method patent that's associated with the listed product, you have to certify to it. But if the applicant isn't seeking approval for that use, you just need a statement. And that's what Roman at three is doing. That's, that's the role it's playing. It's not superfluous. It's implementing 505B2A. When 505B2 says you have to certify to a patent which claims a use for such drug for which the applicant is seeking approval. Now your brother colleague from Elliott says that they are claiming or seeking to approval for the same use because you just look at the category in the orange book. Your response to that is? Well, you start with, remember Roman at one defines the universe of patents you have to worry about. And you only, if you're the applicant, you only need to worry about patents that are associated with the listed drug. And so because HITMA relied solely on Colprobenethad, it did not have to certify to any patents because there are no patents associated with that drug. You do not have to go through the entire orange book. Your argument is different than the government's argument on this. This is interesting. Okay. I think we're essentially saying the same thing. No, no. It's a different argument. Okay. It is. It is a different approach. I'll give you that. But I think it's also interesting that the industry on both sides all agrees with FDA on this. Takeda is not arguing that you have to go through the entire orange book pharma, which Violet Amicus isn't arguing that. The Generic Association isn't arguing that. This is the way it's always worked. This is the way the industry understands it works. What about Elliott? Don't you see they have a broader argument? They're not the industry. They are investors. So they don't have the same credibility in this court? No. I am by no means suggesting that. What I am suggesting is that those parties who are in the pharmaceutical industry all agree on how the statute works. And there's a quid pro quo. If you rely on another product for approval. That's why investors are around, because they can add a comparative advantage. And I have nothing against investors at all. Oh, I'm glad to hear that. But they're not part of the quid pro quo. The quid pro quo is if you rely on another party's product for approval, you have to certify to that other party's patents. And there's a huge benefit. Because the quid pro quo here is that if the applicant is relying on data that's not theirs, well, then the patentee now can get a 30-month stay. It's a free injunction. It's an injunction that the federal circuit in this case said Takeda is not even entitled to. And so it's a huge benefit to invoke this quid pro quo. And it's tied to the list of drugs. Well, the federal circuit is not deciding the same issue, are they? You mean the issue before this court? No, the federal circuit decided the patent issue. Right. And if we thought the FDA had behaved arbitrarily and capriciously, the federal circuit's decision would not be relevant. I disagree. Explain that. Well, because let's say hypothetically that this court were to rescind approval and then it goes back to the agency and then HCMA makes a Paragraph 4 certification. Because of this federal circuit ruling, Takeda could not in good faith bring a lawsuit that HCMA's label induces infringement of the patent. The federal circuit already said, no, it doesn't. You're not entitled to an injunction. And, in fact, just a couple weeks ago ---- The 30-month period goes away then? The 30-month period goes away upon a judgment of dismissal. And there hasn't yet been a judgment of dismissal. That was in a PI posture. That was in a PI. But, yes, it was in a PI posture. And then it goes up in a PI posture of the federal circuit, and it's a 2-1 decision, right? That's correct. But the issue, the key issue, is whether the label induces infringement of the patent. The contents of the label is undisputed. The label hasn't changed. And, yes, it was in the PI posture. But this type of inquiry, whether a label induces infringement, is decided as a matter of law. So, technically, yes, it's in the PI context. But just a couple weeks ago, at the motion to dismiss hearing, before Judge Robinson in Delaware, Takeda's counsel conceded that the approved Mitigar label ---- I'm sorry, this is what Takeda's counsel said. Your Honor, the federal circuit decided the label was not enough and that the label ---- Keep going. Oh. I'm just going to say, a statement by counsel about the federal circuit in a PI posture, I'm not sure this is going to be binding, but go ahead. Well, no, I'll get to the point. It's a good gotcha, but I don't think it gets you very far, but go for it. Well, no, I do think it gets us to the point where what's the remedy here? It would be pointless to rescind ---- Not until there's a final federal circuit judgment, right? Well, no, because if it's ---- Right now, the issue, the only reason there's no ---- What if the federal circuit reaches the, we've done this, reached one conclusion about the law on a PI and reached the opposite conclusion when it comes in for the merits? That's, I mean, it's not every day, but it's happened. Well, but the issue now before the district court is really about whether there's some off-label market. That's the only reason there's no judgment. So Takeda amended its complaint and is now alleging that HCMA is taking certain conduct, apart from its label, that is inducing infringement. And that's why there hasn't been a judgment. But that type of ---- The judgment would be the, let me just make sure I understand, correct me if I'm wrong, the judgment would be the final judgment on appeal, correct? No, no, district court judgment defeats the stay. And so there's a motion to dismiss pending, and Judge Robinson said she may rule by the end of this month. So even if the appeal, if you get a, and the question would be if you get a stay of that judgment from the federal circuit? No, no, no. Even if you get a stay of the judgment from the federal circuit? Oh, if you get a stay of the judgment? I don't know. I mean, the way the statute works is if the district court enters a judgment of non-infringement, which is most ---- And there's no stay from, go ahead. Suppose the district court enters the judgment. Does that mean this case is moved? Is that what your argument is? Well, I would submit if the court, if the district court enters judgment, then the portion of the case, the main portion of the case, asking for rescission of approval and a Paragraph 4 certification would be moved because they couldn't get a 30-month stay. So there would be no point. But the portion of the case saying that the label should say more than it does, that wouldn't be moved, right? That wouldn't be moved, although I would submit the remedy there, if the court were to find a violation, would be to remand back to FDA to explain and provide a justification for HICMA's label in light of the citizen petition ruling. It wouldn't be. This court is not in a position to tell FDA what to put in HICMA's label. That's a scientific determination. That would be for FDA to decide. You mentioned a document. Could you provide that to the court? I'd be happy to. Thank you. I'll give you a couple of minutes for rebuttal. Thank you, Your Honor. Let me start with the regulation because, as you heard, not even FDA and HICMA agree on it.    Even today, when you heard the government get up, they did not suggest that its regulation was ambiguous. And we know. We know that the Regulation 3B has an independent duty. And the reason we know that it has an independent duty is because, if you look in the regulations at I-6, which talks about the amended certifications, it talks about how amendments will be made to all certifications done under I-1i through I-1-3. The notion that HICMA says, well, it's all folded up, and if you don't comply with I-1i, you're done, that does render I-1-3 superfluous. That's what they're arguing. I-1-3 gives effect to that portion of the statute that reads, for which the applicant seeks approval. That does not appear in I-1i, and that's why it does appear in I-1-3. Real briefly, I wanted to respond to a couple other points that were made here. I would respectfully disagree with HICMA's counsel on the industry not agreeing. What has happened in this situation is we have three generics who are sitting on the sidelines who followed along and filed ANDAs, and they filed ANDAs for the Colchicine product. If all they had to do was change to a capsule and get on the market like HICMA did, why on earth would three generics be sitting on the sidelines after litigating these cases? The industry does not agree with HICMA. HICMA is all alone on this issue because this issue of patent certification has been wrongly handled by the agency, and that's why it's got to be sent back. But the briefs don't support your interpretation of the regulation that had been filed by the amicus, either the generics or the brand name, if you want to develop it up like that. Yeah. No, respectfully, Your Honor, they didn't address the issue. I think they were addressing the reliance issue and some of the labeling issues, I think. But I don't think they addressed the issue of the regulation one way or the other. Either side did. I was just bringing to bear this question of, you know, where is the industry on this question, which HICMA's counsel raised, and I wanted to give you a full perspective. The one other point. I don't understand the point about the generics sitting on the sidelines. What is the point you're making about that? Sure. The argument that HICMA advances here is that this is the way it's been done for years and years. There's never been a question until Elliot raised it, and this is the way the industry does it. They pick a drug, they rely on it, and they certify to those patents, and they ignore everything else. And the reason I say that the facts in this case and the situation doesn't support that is because there were three other generic companies that all wanted to do exactly what HICMA did. They wanted to release a generic version of Colchicine. And if they all believed, as HICMA wants you to believe, that you just need to change to a capsule and reference a drug that has no patents on it, why would three of the big competition generics not follow in their footsteps if HICMA was right that that's what the industry does? Well, surely if HICMA wins, they'll be there. No doubt. No doubt. And we fully expect that that would be the case. I don't know. I still don't know what that shows. It shows that HICMA tried a different approach, I'll put it that way, neutrally. They're a pioneer. There's no doubt about it. Different legal approach. There's no doubt about it. But that's why I disagree that this is some sort of industry approach that has been going on for years and years and years. The last quick thing I wanted to mention, Judge Cabot, I believe you mentioned it first, which was, well, what happens when this court reverses or sets aside the agency action, which is what happens? By the way, we're all talking about Section D1. D6, that same statute, requires that it be set aside if the patent certification hasn't been made. So that's the other ground that exists as to why this needs to be set aside in terms of agency action. The agency action gets put aside. The question then your Honor asked was, well, then what happens? Do we get a 30-month stay? Do we get litigation? It will start from what does HICMA do at that point in time? Does the agency get another crack? Well, they will get another crack depending upon what HICMA does. If HICMA decides to pursue this application further, then they're going to have to deal with the certification process. If they change to a tablet, which wouldn't be surprising, then they're going to have to deal with that certification process. But what will happen is, remember, the only reason they wanted it, they only wanted the capsule. No, no, wait a minute, counsel. If we remanded to the agency, hypothetically, for a better explanation of a number of things, including the regulation, what is the status quo at that point? No, if you remanded for a better explanation, then you're right. HICMA's application would have to stay, and the agency would have to give you a better explanation. If you reversed. So what would the market situation be? Well, they would have to remove Mitigar from the market because it would not be an approved drug at that point. And then HICMA would be selling an unapproved drug. So a remand is, for those purposes, the same as vacating? Right. It would be vacating, at least temporarily, the agency decision or setting aside that agency decision because there would be no final agency decision approving a drug. We'll have to ask counsel about that. I'm happy to answer any other questions the court may have, either on the regulation or elsewhere. Okay. Thank you very much. If I could make three points, the first on reliance and science, the second on this capsule versus tablet business, and then the third on the label. The first is, Judge Silberman, just to close off the original question you asked government counsel, the site you're looking for is Joint Appendix 338, and that's the place where government counsel below said, quote, if FDA had relied, we would have rejected the application because it would not be complete. Right. So I think you finally brought government counsel around on that, and what she ended up pivoting to was the idea that this was a scientific judgment. To begin with. Well, what about that? What about that? Let's assume, hypothetically, you have a drug like Colchris, and the government really genuinely believes that it isn't necessary to discuss Colchris. It's not necessary to rely on it, but we want to discuss it because it is a comparable drug, and we look at it just to see various factors. But we make a scientific judgment it is not necessary to rely on it. How can we gainsay that? I think in the circumstance where you're talking about a general discussion that the FDA engages in about a particular drug substance or an active moiety and how it interacts with other drugs and all of those generalities, you probably couldn't gainsay it. But the problem is here, what government counsel omitted to talk about was really the mother load of sites that show that that wasn't just a conversation in the air. It was a comparison and combination of data, and those are the sites relating to that all-hands 50-person FDA meeting. So 908, 915 of the joint appendix, 928, 929, which is where FDA specifically says the label is not supported by HCMAS data, 930, 933, all of those talk about the data, not just about Colchris, not just about the fact that there's another colchicine drug out on the market. So to the extent that there was a scientific determination that really lies at the bottom of this, as you heard 11 times, it was in part on our science. But Judge Kavanaugh used the word distinguish. Do you want to respond to that? I do. I think it is impossible to square the idea that this was a mere distinguishment of different data from what the label actually holds for the reason that FDA previously said. I mean, that's one of the remarkable things about this case, is that everything we have to offer you is based on an affirmative statement that FDA made in the record relating to what the label had to say. And one of the things that the FDA said was not just that HCMAS data showed something different from Mutual's old data, it was that you can't reconcile what needs to go on the label with HCMAS data. So that's not a distinguishing. That's actually adopting in part the holding of another. In other words, HCMAS data by itself would be inadequate. Counsel said, however, even if that was true, there was other information out there unrelated to Colchris. Right. That would have led to the same modification of the label. That's right. I believe what government counsel said was that this was not news. And I think the FDA, at least as of 2011, would beg to differ, because what the FDA again said in the citizen petition response was, without this review by FDA of the Colchris data, outdated assumptions of what is safe and effective for treatment with oral colchicine would have remained unchecked and patients would have continued to suffer from adverse reactions such as severe GI complications and even death. Joint Appendix 479. Joint Appendix 487. That was a citizen petition filed by? No. No, that was FDA. I know. That was in response to a citizen petition, right? It was. By whom? It was in response to a citizen petition by Mutual. That's what I thought. Mutual. So this is FDA's statement about Mutual's data, followed by this. What was prompting, remind me, Mutual's citizen petition? The Mutual's citizen petition was filed because when HCMA originally filed its application, what it filed was a 505B2 application, which is this short-form new drug application for a tablet. For the duplicate. For the duplicate, for the exact duplicate. And the FDA said you can't do the duplicate through that, and they said, okay, we'll go to the capsule. And I'd like to get to that in one moment, but just to tie this point off. Thank you. At Joint Appendix 487, what FDA says is the requirements for approval of a single-ingredient colchicine product have changed based on the safety concerns identified during review of the Colchris application. Joint Appendix 487. So the idea that this was not news, that Colchris's data was not new, that there was nothing to add, that some 1997 article that none of us has seen actually revealed all this, is belied by what FDA does. So is your argument the key evidence of reliance is in the citizen petition rather than in the basic opinion that we have before us? No, I think it goes to two different strands of what you heard from the government's response. My argument on reliance is very similar to the question Judge Kavanaugh posed, counsel for HCMA, I believe, which is this isn't really a scientific determination, it's just trying to decide what reliance means. And what reliance clearly means is when you look at the data and you assess it and you combine it with the data that you got from the other guy and you decide to make a label based on all that data, you've relied. That's not a scientific determination, nor is it a scientific determination to decide that you're not going to include information that you required be included five years ago. But if, you know, we've been using hypotheticals based on how courts write opinions, if we write an opinion and we say we're relying on, you know, Marbury v. Madison, but then we have C also five other cases, have we relied on the cases in the C also? I think you would, I think in those circumstances you would have the best case that you relied on Marbury because that's what you said you were doing. And a C also is just kind of aggregating additional information around the edges. Colchris was Marbury v. Madison here, if we're going to draw that analogy. Colchris was the gorilla in the middle of the room. That's why they brought 50 people in to talk about it. Who does that make Chief Justice Marshall then? The active moiety, Your Honor. They say not only could we have approved without the Colchris data, but we said that we could have approved and would have approved. So you want to respond to that as well? I want to make sure you respond to everything they said. So with respect to could have approved with the Colchris data, without the Colchris data, here's the problem with that. What government counsel is now suggesting is, well, if you let us go back and give us another chance to explain how we could have approved this without the Colchris data, that ship has sailed. Why? Because what this record is based on is the Colchris data. So you couldn't just go back and ask for a new explanation. What you'd have to do is remand direct vacator. Vacator, but they could go through the same process again, presumably quickly, and conclude without any reference or reliance, no matter how broadly you define it on the Colchris data, and reach the same bottom line, theoretically. And then you would argue actually that the information in there doesn't support the bottom line. In comporting with what you said when I first stood up, Your Honor, yes. That would be the problem with that subsequent conclusion. The data is necessary. This wasn't just sort of a chance mistake by FDA. It was necessary for FDA to reach this conclusion. You would draw a line between the application and the label and say, well, the label doesn't make any sense. If you just look at the application, you have to look at Colchris data to explain the label. That's correct. In that hypothetical, that is correct. I think that is what we would have to do. So if I can. So if we were inclined to remand, what is your explanation of what the record would look like down below? So as I put it when I first stood up, I think the proper course would be for this court to reverse and direct summary judgment be entered. Judge Jackson would then direct. Suppose we didn't quite buy all that. What intermediate position is there? Your Honor, with respect to our latter two arguments, the failure to explain the acute gout flare indication, the failure to explain the decision not to include reduced dose adjustments, those are more on the label. Those are more quintessentially susceptible to a remand rather than a flat-out vacator. We might be confusing remand to the agency. The district court has to get it back to the agency under your view. Yes, the district court in all of these scenarios, I think, the pass-through to the agency. But in the usual case when you've got a failure to explain, you would remand for the agency to explain. With this exception, here you have the agency, again, in Joint Dependents 1008, 1009, 1010, saying there are safety issues associated with how this drug is labeled. So I would suggest that when it gets back to the agency, to the extent, and we can brief this if you wish, to the extent that the remand itself does not work an automatic vacator of the approval, as Mr. Sitzman suggested, to the extent there is something left of the approval, FDA needs to vacate it on that ground. The statute and the regulations may do the work for it. FDA could make that determination, but we think in either case FDA would have to vacate. Let me say one more word, though, if I can, on the capsule and the tablet issue. What you heard both Government Counsel and Counsel for HCMA say is that the label couldn't contain the same kind of information that's on the Colchris label because this is a capsule. They said it a number of times. That issue, by the way, comes up exactly once in the Joint Appendix, at Joint Appendix 954 back in 2011. So the fact that they're relying on it, I will let that slide. But in any event, what that one statement says is those modifications wouldn't be appropriate where we're talking about a capsule because a capsule can't be split. So what the label says is, and this is Joint Appendix 628, if you have to administer this with those other drugs, reduce your dosage or reduce the dose frequency. That's how they got around the capsule-tablet problem. And it is in any event no explanation for the failure of FDA to require the information it said was required on the label. So for all of those reasons, FDA plainly relied, plainly abdicated its previous conclusions about the information that was required. It should be reversed and the approval vacated. But I don't really understand the point you just made because they said reduce your dose. They said reduce the dose or the dose frequency. Yes, but so even if they didn't say or dose frequency, your argument would be that they're relying on the Colchris data to say reduce your dose. Oh, I certainly would say that, yes. But I'm saying if they are thinking that the capsule is some kind of a basis for distinguishing what should have gone on the label, yes. The fact that it says reduce your dose at all pertains to the Colchris mutual data. Are you making a separate argument now that the label is unsafe? No, I'm not. We have never made that argument in this court that the label is unsafe except for this. The FDA has said this is the information that needs to be on the label. Without this information, the label is unsafe. That's not our argument. That's FDA's argument. I'm a little confused about your difference between the tablet and the capsule. I thought you were suggesting that the label regarding the capsule, Midgard, is inadequate. Oh, no. What I'm saying is what you heard government counsel and counsel for HICMA say is the information It sounds different because you can't break it in half. Right. So what they say is because you can't break it in half, the other thing you can do is reduce how often you take it. That's the difference. So in either event, you're relying on your argument, Colchris. Exactly. That's exactly right. Okay. I see. There are no further questions. Thank you.  Thank everyone for well-done arguments. The case is submitted.
judges: Kavanaugh, Wilkins, Silberman